RECEIPT #_____

AMOUNT $_____

SUMMONS ISSUED_____

LOCAL RULE 4.1_____

WAIVER FORM _____

MCF ISSUED_____

BY DPTY. CLK._____

DATE_____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| J. BONAFEDE CO., INC. <br> on behalf of itself and all others <br> similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DEL MONTE FRESH PRODUCE <br> COMPANY and DEL MONTE <br> FRESH PRODUCE, N.A., INC., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

MAGISTRATE JUDGE _____

Plaintiff, J. Bonafede Co., Inc., on its own and on behalf of all others similarly situated, brings this action for treble damages under the antitrust laws of the United States. Plaintiff's claims as to itself and its own actions, as set forth in ¶¶14-18, 21, 57, 60, 61, 63, 65, 81 and 93 are based upon its own knowledge. All other allegations are based upon information and belief pursuant to the investigation of counsel.

## NATURE OF THE ACTION

1.      This antitrust class action is brought on behalf of all persons or entities who purchased a pineapple commonly referred to within the trade as the "Del Monte Gold™" (also known as "MD-2" or "73-114") directly from Defendants Del Monte Fresh Produce Company or Del Monte Fresh Produce, N.A., Inc., (collectively "Fresh Del Monte" or "Defendants") between March 1, 1996 and May 6, 2003 (the "Class Period"). The "Del Monte Gold™" pineapple is the best selling pineapple in the world. (Fresh Del Monte also refers to the "Del Monte Gold™" as the "Del Monte Gold Extra Sweet™"; they will be collectively referred to as the "Del Monte Gold™"). It is superior in color, taste, sweetness, vitamin C content, brix

content, texture, smell, and durability in storage to the standard pineapple known as the "Champaka."

2.      Plaintiff alleges that Defendants have improperly attempted to and did eventually maintain a monopoly over the propagation, marketing, and sale of fresh whole extra-sweet pineapple in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by: (i) perpetuating a fraud on the United States Patent and Trademark Office ("USPTO") by prosecuting unpatentable claims, one of which was rejected and the other Del Monte admitted in 2003 was improperly obtained; (ii) issuing false, misleading, and threatening letters to competitors and others, including the statement that " Del Monte Gold$^{TM}$" pineapple was patented by Defendants; and (iii) commencing sham patent litigation in order to stymie competition in the extra-sweet pineapple market.

3.      In an attempt to obtain legal rights to a variety of extra-sweet  pineapple, and to foreclose competitors from raising and selling such pineapple, Defendants filed a patent application for " Del Monte Gold$^{TM}$" pineapple in 1992. The USPTO rejected Defendants' patent application on the ground that the " Del Monte Gold$^{TM}$" variety was already within the public domain by virtue of pre-patent sales in the United States. The application was also rejected because the rights to the " Del Monte Gold$^{TM}$" pineapple were co-owned with another entity which refused to accede to Defendants' demand for a joint patent.

4.      In a further attempt to obtain a patent to preclude competition, Defendants created a genetic sibling to the "Del Monte Gold$^{TM}$." On August 16, 1994, Defendants improperly obtained a patent on the genetic sibling known as the Calvin Oda or "CO-2" pineapple.

5.      Knowing the "Del Monte Gold<sup>TM</sup>" pineapple was unpatented and unpatentable and utilizing the new CO-2 patent, Defendants engaged in an anticompetitive campaign designed to stifle competition and maintain a monopoly over the fresh whole extra-sweet pineapple market.

6.      This anticompetitive campaign included issuing false, misleading, and threatening letters to Dole Fresh Fruit Company ("Dole"), Costa Rican growers and others within the trade, claiming proprietary rights over varieties of extra-sweet pineapple when, in fact, no such legal rights have existed.

7.      For example, Defendants wrote letters claiming that some of their material had been *stolen* and that the recipients of the letter might be in possession of some of the *stolen* material. Defendants also improperly claimed the *patent covered the "Del Monte* Gold<sup>TM</sup>*" pineapple*, thereby causing recipients to incorrectly believe Defendants had *a legally protected interest* in the "Del Monte Gold<sup>TM</sup>" pineapple and to fear that Defendants would commence a patent infringement action against those who misused their purported property.

8.      Thus, in addition to issuing false, misleading, and threatening letters to competitors, instilling fear that they would be sued if they attempted to grow or sell "Del Monte Gold<sup>TM</sup>" pineapples, Defendants also filed sham litigation against Dole, as well as Maui Land and Pineapple Company, Inc. and its subsidiary Maui Pineapple Company, Ltd. (collectively "Maui Pineapple"), to prevent them from entering the fresh whole extra-sweet pineapple market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Specifically, Defendants contended these two competitors, not surprisingly Defendants' two largest potential competitors, infringed a claimed patent on "Del Monte Gold<sup>TM</sup>" pineapple.

9.      Despite pursuing these suits for several years, notably in May of 2003, *Defendants admitted the CO-2 patent was obtained improperly.* They withdrew the patent for the same reason the USPTO had rejected the "Del Monte Gold[TM]" patent application: the pineapple was within the public domain prior to the patent application by virtue of pre-patent sales of the pineapple in the United States.

10.     As a direct and proximate result of Defendants' anticompetitive conduct, competitors did not produce competing extra-sweet pineapple because Defendants, through their actions, convinced the competitors that the "Del Monte Gold[TM]" was successfully patented when, in fact, it was not. The absence of competing extra-sweet pineapple in the market has forced Plaintiff and members of the Class to pay supracompetitive prices, thereby causing them to sustain injury to their business and property.

## JURISDICTION AND VENUE

11.     This complaint is being commenced under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for injuries Plaintiff and members of the class sustained by reason of Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

12.     Jurisdiction is conferred upon this court pursuant to 28 U.S.C. §§ 1331 and 1337, and by § 4 of the Clayton Act, 15 U.S.C. § 15(a). This Court has supplemental jurisdiction over the common law claim pursuant to 28 U.S.C. § 1367.

13.     Defendants transact business, maintain offices, or are found within this state. The interstate commerce described hereinafter is carried on, in part, within this District. Venue is proper in this District pursuant to the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391.

## PLAINTIFF

14.    Plaintiff J. Bonafede Co., Inc., is a Massachusetts corporation with its principal place of business at 29 N.E. Produce Center, Chelsea, Massachusetts, 02150. During the time period covered by this Complaint, Plaintiff purchased "Del Monte Gold$^{TM}$" pineapple directly from Defendants.

## DEFENDANTS

15.    Defendant Del Monte Fresh Produce Company is a Delaware Corporation, which maintains offices at 105 Shawmut Road, Canton, Massachusetts, 02021.

16.    Defendant Del Monte Fresh Produce, N.A., Inc., is a Florida Corporation, which maintains offices at 105 Shawmut Road, Canton, Massachusetts, 02021.

17.    Fresh Del Monte does a substantial amount of business in Massachusetts, including the distribution and sale of the "Del Monte Gold$^{TM}$" pineapple through its offices in Canton, Massachusetts. Further, Fresh Del Monte first introduced the Del Monte Gold pineapple to the United States Market in Boston, Massachusetts.

18.    Defendants market and sell the " Del Monte Gold$^{TM}$" pineapple around the world. In 1998, pineapple sales constituted sixty-five percent of Defendants' gross profit. In 2002, $440 million of Defendants' $2 billion in revenue came from pineapple sales. Fresh Del Monte does a substantial amount of business in Massachusetts, including the distribution and sale of the "Del Monte Gold$^{TM}$" pineapple through its offices in Canton, Massachusetts.

## TRADE AND COMMERCE

19.    During the Class Period, Defendants propagated, marketed, and sold "Del Monte Gold$^{TM}$" pineapple in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the state in which Defendants resided or produced the pineapple.

20.    The business activities of Defendants that are the subject of this Complaint, were in the flow of, and substantially affected interstate trade and commerce. Defendants frequently use interstate transportation and communications in connection with their business.

## FACTUAL BACKGROUND

### *Background Regarding the Fresh Pineapple Trade*

21.    Fresh Del Monte is the largest marketer and seller of fresh whole pineapple in the world, and has been engaged in, and currently engages in interstate commerce of fresh whole pineapple in the United States.

22.    The fresh whole pineapple market has very few participants, even relative to the fresh fruit market in general, and there are significant barriers to the entry of new competitors. The three main competitors in the market are Fresh Del Monte, Dole, and Maui Pineapple. These companies compete directly for the same wholesalers, distributors, and retail customers in the United States fresh whole pineapple market, and more specifically, in the market for fresh whole extra-sweet pineapple—the hybrids at issue in this litigation.

23.    Fresh Del Monte has controlling shares in both the general and more specialized market for fresh whole pineapple. As of April 2001, Fresh Del Monte had approximately a 60% share of the United States fresh whole pineapple market, compared with an estimated 30% share by Dole, an estimated 5% share by Maui, and the remaining 5% by the few other competitors in the market. As for the specialized extra-sweet and non-traditional market, Fresh Del Monte has an even larger market share: greater than 75%.

### *History of the Development of the Fresh Pineapple Hybrids*

24.    The Pineapple Research Institute of Hawaii ("PRI") was a Hawaiian unincorporated trade organization formed in 1941 as a department of the Pineapple Producers Cooperative Associated, Ltd. ("PPCA"), a corporation organized and existing under the laws of

the Territory of Hawaii. In February 1944, following the dissolution of PPCA, PRI was
reorganized under the same name and existed until its dissolution in 1987.

25.     One of the activities of PRI was the experimental cultivation and creation of new
pineapple varieties. The PRI was a trade group of growers that conducted joint research in a hot
house laboratory on the island of Maui, Hawaii. At that time there was a standard variety of
pineapple known as the "Champaka." Scientists at PRI were experimenting to improve the
standard variety.

26.     One specimen that was developed, PRI 73-114, was bright yellow in color,
sweeter, less acidic, and highly resistant to parasites and internal rotting. While standard
pineapples were green, this pineapple turned "gold" in color when ripe. It could survive cold
storage for up to two weeks while the Champaka began to rot after just a week.     This new
variety of pineapple came to be known as the MD-2 variety.

27.     The PRI dissolved in 1987. Seedlings of PRI 73-114 were turned over to Fresh
Del Monte and Maui Pineapple, the two remaining members of the PRI.

### Del Monte Begins Developing and Selling the " Del Monte Gold$^{TM}$" Pineapple, and By Misleading the USPTO, Obtains Patent 8863

28.     In the late 1980's or early 1990's, Fresh Del Monte began selling small amounts
of the MD-2 fruit in the United States under the name "Del Monte Gold$^{TM}$". Some were shipped
to Publix stores in Florida and some to the Stop and Shop stores in Boston.

29.     The "Del Monte Gold$^{TM}$" pineapple quickly became an enormous commercial
success and has remained the pineapple of choice in this country and the world.

30.     Although Defendants previously sold the "Del Monte Gold$^{TM}$" pineapple in
discrete locations in the United States prior to 1994, it was not rolled out nationwide until early
1996.

31.    In 1992, Fresh Del Monte tried to patent the "Del Monte Gold[TM]" pineapple. It could not patent the pineapple for two reasons. First, Maui Pineapple co-owned the rights and refused Fresh Del Monte's terms for a joint patent. Second, this variety of pineapple had been for sale in the United States for several years before Fresh Del Monte applied for a patent, thus violating the patent rule against prior sales.

32.    In 1994, through fraud and acting in violation of its duty of candor, Fresh Del Monte secured a patent from the U.S. Government for a pineapple called the "CO-2" pineapple ("Patent 8863"). During the patent application process, Fresh Del Monte enlisted Maui Pineapple's former employee, David Williams, to sign the patent application as a co-inventor along with Del Monte's employee Calvin Oda (the CO-2 pineapple was named after Calvin Oda). However, Dr. Williams never even knew which variety of PRI stock was purporting to be patented. Moreover, in order to persuade Dr. Williams to assign his rights of inventorship, Fresh Del Monte intentionally excluded information regarding the pineapple variety's development from the patent.

33.    That conduct, and the series of misrepresentations and omissions that followed, were material for a number of reasons. Foremost amongst them was the fact that pineapple hybrid varieties PRI 73-50 and PRI 73-114 has the same "parents", which are known and identified on the patent application by their PRI hybrid nomenclature: PRI 58-1184 (the "seed parent") and PRI 59-443 (the "pollen parent."). In other words, the hybrids at issue both were developed by cross-pollinating a flower from the PRI 58-1184 plant with pollen taken from the PRI 59-443 plant.

34.    Despite the plants' common lineage, Fresh Del Monte never made the distinction between either of the varieties to the USPTO, and thus never permitted the Patent Examiner to

consider those varieties (or the use and sale of those varieties) by Fresh Del Monte and/or Maui

Pineapple) as "prior art". While Fresh Del Monte represented to Maui Pineapple that the CO-2

was the PRI 73-50 hybrid, it never disclosed that fact to the Patent Examiner; never mentioned

that PRI 73-114 hybrid as prior art; and never made any reference to the Patent Examiner about

Maui Pineapple's right in the PRI 73-50 hybrid at all. Moreover, Fresh Del Monte's "Detailed

Plant Description" of the hybrid clone in the 8863 patent, including such things as "resistance to

internal browning development," leaf characteristics from texture to size and color,

"Inflorescence" (flower) descriptions; and fruit characteristics from size to shape to disease

resistance, among other things, does not accurately describe the characteristics of the PRI 73-50

variety.

35.    In furtherance of Fresh Del Monte's scheme to defraud the USPTO and the

public, on February 1, 1994, in response to the Patent Examiner's invitation to submit a

sectional photograph of the ripe aged pineapple to help clarify which specific plant Fresh Del

Monte was attempting to patent, Fresh Del Monte affirmatively misrepresented to the Examiner

that "such a view is not presently available," and requested that "the drawings be published in

the form originally filed." Fresh Del Monte had both specimens and photographs of the PRI 73-

50 and PRI 73-114 hybrids available at that time, and it had photographs of every other stage of

those plants' developments. As such, Fresh Del Monte's statement to the Patent Examiner was

false, and was intended to deceive the USPTO in furtherance of Fresh Del Monte's plan to

fraudulently procure the 8863 patent, and stifle competition in the market.

36.    Fresh Del Monte continued its fraud against the USPTO by failing to withdraw

its patent, even after notification in 1996 from Maui Pineapple that Patent 8863 was invalid. On

August 14, 1996, Maui Pineapple's Director of Agricultural Research (Herve Pleisch) wrote a

memorandum to Calvin Oda discussing, among other things, Patent 8863. In that memo, Mr.

Fleisch itemized three principal reasons why Fresh Del Monte had no basis for contending this

patent was valid. Mr. Fleisch explained:

> (a)    "...in 1993 David Williams was not an employee nor an officer of Maui Pineapple. Only his name appears on the patent and there is no mention of Maui Pineapple Co. As it reads, this patent is not a joint patent but a Del Monte Patent. However, Maui Pineapple was the only co-owner with Del Monte of the joint PRI hybrids, not David Williams."

> (b)    "...73-50 is described by its parents, the code CO-2 and various phenotypes rather than by its PRI number.... As you know there are 96 hybrids in that lot number that have the same parents and share many of the phenotypic characteristics mentioned in the patent. Therefore, it appears as though the entire lot has been patented and this included 73-114 or 73-90 which all were identified as good fresh fruit varieties."

> (c)    "...you indicated that a plant patent cannot be issued for a variety that is already being commercialized. If that is so, how could this patent be issued since Maui Pineapple has been commercializing the 73-50 and other hybrids to the West Maui Hotels and other customers for many years before 1993."

37.    Rather than recognizing the inherent problems with Patent 8863 as articulated by

Maui Pineapple, Fresh Del Monte still continued to rely on the patent, and even asserted it

against potential competitors to inhibit competition.

### *Del Monte Uses Patent 8863 to Confuse the Public and Competitors, as Well as to Thwart Attempts by Competitors to Participate in the Fresh Whole Extra-Sweet Pineapple Market*

38.    Fresh Del Monte used the CO-2 patent to convince competitors that it had

patented the "Del Monte Gold$^{TM}$" pineapple. Fresh Del Monte's former Vice President of North

America, Mike Pereira, wrote that the company was getting a patent that would "confuse our

competition" into thinking that "Del Monte Gold$^{TM}$" is a "proprietary variety."

39.    Armed with the patent on the CO-2 pineapple, Fresh Del Monte attempted to stop

persons and entities in Costa Rica from growing "Del Monte Gold$^{TM}$" pineapple by sending out

a series of threatening letters. A March 23, 1995 letter to Oscar Arias, an agri-biologist in Costa

10

Rica, written on Fresh Del Monte letterhead and signed by Dan Funk, Del Monte's Vice

President of Research and Development, is a representative example:

> Del Monte Fresh Produce Company is aware that your company
> has acquired pineapple plant material and is researching the
> growth and production of pineapple plants. Del Monte has also
> learned of an organized effort to *steal* this planting material from
> the Del Monte plantation for propagation.
>
> Be advised that Del Monte is the *developer of this plant material*
> and *intends to protect its interests as necessary.* In addition, be
> advised that Del Monte owns U.S. Patent No. Plant 8,863, dated
> August 16, 1994. Please govern yourself accordingly.

40.    This and other threatening letters like it were found[1] to be attempts by Fresh Del

Monte to mislead growers in Costa Rica and other places into mistakenly believing that Fresh

Del Monte had a United States Patent on the "Del Monte Gold™" pineapple. Fresh Del Monte

clearly knew it did not have a patent on the "Del Monte Gold™" pineapple and thwarted

competition by implying that Fresh Del Monte would take legal action to protect its allegedly

patented pineapple.

41.    These actions by Fresh Del Monte caused competitors to refrain from taking steps

necessary to grow the "Del Monte Gold™" pineapple, thereby giving Fresh Del Monte a

monopoly and a long-term competitive advantage.

42.    Pineapple is notoriously difficult to grow and building a pineapple plantation can

take years. Pineapple is grown from the top or crown of a mature pineapple or from pieces of an

existing plant. Each plant only produces one fruit at a time, at a rate of often less than one ripe

fruit per year. By engaging in the anti-competitive acts alleged in this Complaint, Fresh Del

---

[1]    This finding was contained in a judicial order by The Honorable Andrea M. Simonton,
United States Magistrate Judge for the Southern District of Florida, on January 10, 2002, which
was later vacated as part of the settlement between Dole and Fresh Del Monte.

Monte attempted to and has been able to maintain a monopoly in the whole fresh extra sweet pineapple market.

### *Fresh Del Monte Wrongly Files Suit Against Dole to Avoid Possible Competition*

43.    In addition to using its patent as a pretense to send threatening letters, Fresh Del Monte also relied on this patent to assert sham litigation against potential competitors in the extra-sweet pineapple market.  For example, Fresh Del Monte filed a suit against Dole Food Company, Inc. and Dole Fresh Fruit Company (collectively "Dole"), claiming, among other things, patent misuse.  In its suit, Fresh Del Monte took the position that Dole had no legal right to produce, distribute, or sell any MD-2 pineapple.

44.    Dole controls and operates a number of subsidiaries around the world and is Fresh Del Monte's foremost competitor.

45.    Dole responded to this lawsuit by contending that Fresh Del Monte's MD-2 pineapple monopolizes the pineapple market, and that Fresh Del Monte attempted to maintain an unlawful monopoly over the MD-2 pineapple by claiming proprietary rights where it has none. Dole claimed that in order to deceive Dole and others in the trade, Fresh Del Monte took the position that the CO-2 patent also covered the MD-2 pineapple.  In furtherance of this monopoly, Dole contended that Fresh Del Monte:

> (a)    Sent threatening letters to others in the trade which stated that some of Dole's pineapple materials had been *stolen*, that the recipients of the letters might be in possession of some of the stolen material, and implied that Fresh Del Monte patented "Del Monte Gold[TM]" pineapple;
>
> (b)    Made false and fraudulent statements through newspapers and the United States mail in furtherance of its scheme to defraud; and

(c)     Defrauded the USPTO in obtaining the patent on the CO-2 pineapple by not including in the application the PRI designation of the CO-2 pineapple, by not mentioning the MD-2 pineapple in the prior art section of the application, and by not distinguishing the MD-2 from the CO-2 in that section.

**_Fresh Del Monte Further Stifled Competition With Sham Litigation Against Another Potential Competitor, Maui Pineapple_**

46.     In addition to improperly asserting the Patent 8863 against Dole to stifle competition, Fresh Del Monte also used the same patent to threaten Maui Land and Pineapple Company, Inc. and Maui Pineapple Company, Ltd. and prevent them from competing in the fresh whole extra-sweet  pineapple market.

47.     Maui Pineapple Company Ltd. is a wholly-owned subsidiary of Maui Land & Pineapple Company, Inc.  Like Fresh Del Monte, Maui Pineapple was also a member of the PRI.

48.     In 1981, PRI released to its members for production the two hybrid pineapple varieties known as PRI 73-50 and PRI 73-114 (i.e. MD-2).  Maui Pineapple was a PRI member of good standing on the date these two hybrids were released, and as such, was given a proprietary interest in both these hybrids.  That interest included the right to develop, grow, market, and sell both hybrids without the consent of PRI or any other entity, including but not limited to Fresh Del Monte.

49.     After PRI dissolved in 1987, Maui Pineapple continued growing and marketing of both PRI 73-50 and 73-114.  The PRI 73-50 hybrid is marketed by Maui Pineapple in the United States under the trademark "Hawaiian Gold".

50.    After obtaining Patent 8863, Fresh Del Monte brought a claim against Maui Pineapple for patent infringement, contending Maui Pineapple's use, cultivation, distribution, and sale of the 73-50 hybrid plant variety violated that patent.[2]

51.    In response, Maui Pineapple filed a cross-claim against Fresh Del Monte for, among other things, conspiracy to monopolize, attempt to monopolize, monopolization, and restraint of trade under Clayton Act Section 3. Specifically, Maui Pineapple contended that Fresh Del Monte used its fraudulently-procured patent rights to restrict competition by telling Maui Pineapple's customers and potential customers that Maui Pineapple was not a legal supplier of the PRI 73-50 hybrid pineapple, and that Fresh Del Monte was the only legal supplier of the PRI 73-50 hybrid; and /or by indiscriminately publicizing its objectively baseless infringement allegations to wholesalers, distributors, retailers, and other participants in the United States pineapple trade, and to the general public.

52.    Fresh Del Monte fought its patent infringement lawsuit for almost two years. Throughout this time, Maui Pineapple was not permitted to create a competing extra-sweet pineapple because of Patent 8863.

### *Despite Its Suits Against Competitors for Alleged Patent Misuse and/or Infringement, Del Monte Withdraws Patent 8863*

53.    Despite its suits against its two main competitors, Dole and Maui Pineapple, on January 31, 2003, Fresh Del Monte filed a Motion to Dismiss its patent infringement claim

---

[2]    This suit was brought as a cross claim to Maui Pineapple's trademark infringement cause of action against Del Monte for use of the term "Hawaiian Gold." *See* Maui Pineapple Co., et. al. v. Del Monte Co., et al., Northern District of California, Case No. C0-1449 (Filed 4/27/01).

against Maui Pineapple. In this motion, Fresh Del Monte admitted that the patent was invalid due to pre-patent sales by Maui Pineapple.[3]

54.    Fresh Del Monte waited several more months before contacting the USPTO, and finally withdrew its patent on the CO-2 pineapple on May 6, 2003.

55.    The lawsuits with Dole and Maui Pineapple were settled and the terms of the settlement for either suit are not public. Nevertheless, both Dole and Maui Pineapple are increasing their "Del Monte Gold[TM]" pineapple programs in a bid to grab market share in the current market.

56.    By using an improperly obtained patent on a CO-2 pineapple to keep viable competitors out of the marketplace for extra-sweet pineapple, Fresh Del Monte has unlawfully attempted to and eventually did maintain a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Now, approximately eight months after Fresh Del Monte withdrew Patent 8863, the price for " Del Monte Gold[TM]" pineapple has begun to fall.

57.    Once Fresh Del Monte obtained this unlawful monopoly, it used this stronghold position to further harm customers by tying other products with the "Del Monte Gold[TM]" pineapple in order to force customers to purchase products they did not necessarily want or need. For example, Fresh Del Monte mandated that in order for certain wholesalers to be able to order "Del Monte Gold[TM]" pineapples, they also had to purchase Fresh Del Monte bananas.

## PRODUCT MARKET/GEOGRAPHIC MARKET

58.    The product market consists of the fresh whole extra-sweet pineapples.

---

[3]    *See* Defendants' Notice of Motion and Motion to Dismiss Patent Counterclaim, Maui Pineapple Co., et. al. v. Del Monte Co., et al., Northern District of California, Case No. C0-1449 (Filed 1/31/03) ("Maui's pre-patent sales invalidate Del Monte's patent. Accordingly, pursuant to Rule 41 of the Federal Rules of Civil Procedure, Del Monte's counterclaim for patent infringement should be dismissed.") (internal citations omitted).

59.    The geographic market is the United States.

## FRAUDULENT CONCEALMENT

60.    Fresh Del Monte has fraudulently concealed the existence of the antitrust violations alleged herein. Plaintiff has exercised due diligence to learn of its legal rights and, despite such diligence, failed to uncover the existence of the alleged violations until after May 6, 2003. Defendants affirmatively concealed the existence of the violations alleged through the following actions, among others:

(a)    By falsely obtaining a patent on the CO-2 pineapple in 1994;

(b)    By falsely representing that the CO-2 patent covered the MD-2 pineapple when in fact it did not;

(c)    By sending letters to potential competitors asserting trademark and patent violations when Fresh Del Monte knew it had no rights under the patent and trademark laws for protecting the MD-2 pineapple;

(d)    By not admitting until January 31, 2003 that the CO-2 patent was obtained improperly and could never have been obtained because of prior sales;

(e)    By maintaining sham patent litigation against Dole and Maui Pineapple, asserting patent rights for the MD-2 and CO-2 pineapple that it knew did not exist;

(f)    By keeping settlement terms of its litigation with Dole and Maui Pineapple secret; and

(g)    By placing incriminating documents under seal in its litigation with Dole and Maui Pineapple.

61.    Plaintiff exercised due diligence to learn of its legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the antitrust violations alleged above until after May 6, 2003, the date Del Monte withdrew Patent 8863.

## CLASS ACTION ALLEGATIONS

62.    Plaintiff brings this action on its own behalf and as a class action under the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following classes:

> All persons or entities (excluding governmental entities, Defendants, their parents, subsidiaries and affiliates) who purchased a "Del Monte Gold™" pineapple directly from Del Monte Fresh Produce Company or Del Monte Fresh Produce, N.A., Inc., during the period from March 1, 1996 through and including May 6, 2003.

63.    Plaintiff does not know the exact number of class members, because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the class members are sufficiently numerous and geographically dispersed throughout the United States that joinder of all class members is impracticable.

64.    Except as to the amount of damages each member of the class has by itself sustained, all other questions of law and fact are common to the class, including, but not limited to:

(a)    Whether Defendants unlawfully monopolized or attempted to monopolize the United States extra-sweet  pineapple market during the Class Period;

(b)    Whether Defendants engaged in anti-competitive conduct in order to unlawfully maintain a monopoly;

(c)    Whether the geographic market for the anti-competitive activity is the United States fresh whole extra-sweet pineapple market;

(d)    Whether the product market is the fresh whole extra-sweet pineapple;

(e)    Whether pro-competitive reasons exist for Defendants' actions;

(f)    The effects of the monopolization on the prices of extra-sweet pineapple sold in the United States during the Class Period;

(g)    The appropriate measure of damages sustained by Plaintiff and other members of the class; and

(h)    Whether Defendants fraudulently concealed the existence of the antitrust violations alleged herein.

65.    Plaintiff is a member of the Class, and Plaintiff's claims are typical of the claims of other Class members. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a typical purchaser of "Del Monte Gold™" pineapple grown by Defendants for sale in the United States and its interests are coincident with and not antagonistic to those of other members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

66.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

67.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

68.    A class action is superior to other methods available for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate an antitrust claim such as is asserted in this Complaint. This action likely presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily ascertainable.

## CAUSES OF ACTION

### COUNT I
(Monopolization)

69.    Plaintiff incorporates by reference paragraphs 1 through 68 herein.

70.    At all times relevant herein, Defendants possessed a monopoly over the fresh whole extra-sweet pineapple market.

71.    The fresh whole extra-sweet pineapple market constitutes a relevant product market.

72.    At all times relevant herein, Defendants possessed monopoly power over the fresh whole extra-sweet pineapple market in the United States.

73.    At all times relevant herein, Defendants willfully acquired, maintained, and exercised monopoly power over the fresh whole extra-sweet pineapple market in the United States.

74.    At all times relevant herein, Defendants exercised monopoly power over the fresh whole extra-sweet pineapple market in order to exclude meaningful competition within this market.

75.    Defendants monopolized the market for fresh whole extra-sweet pineapple by engaging in the following anti-competitive actions:

(a)    By falsely obtaining a patent on the CO-2 pineapple in 1994;

(b)    By falsely representing that the CO-2 patent covered the MD-2 pineapple when it did not;

(c)    By sending letters to potential competitors threatening trademark and patent violations when it knew it had no rights under the patent and trademark laws for protecting the MD-2 pineapple;

(d)    By not admitting until January 31, 2003 that the CO-2 patent was obtained improperly and could never have been obtained because of prior sales; and

(e)    By maintaining fraudulent lawsuits against Dole and Maui Pineapple asserting patent rights for the " Del Monte Gold[TM]" pineapple that Fresh Del Monte knew did not exist.

76.    These actions are in violation of 15 U.S.C § 2 *et seq.*, in that they serve to restrain competition in order to allow Defendants to stabilize or raise the price of extra-sweet pineapple sold around the world during the Class Period at a level that would not exist in a competitive market.

77.    There is no pro-competitive justification for Defendants' actions.

78.    Defendants acted with an anticompetitive purpose resulting in an anticompetitive effect.

79.    Defendants' acts and conduct have been done for the following purposes:

(a)    to prevent competitors from entering the extra-sweet pineapple market;

(b)    to maintain a monopoly over the propagation, marketing and sale of fresh whole extra-sweet pineapple; and

(c)    to monopolize and attempt to monopolize the propagation, marketing and sale of fresh whole extra-sweet pineapple.

80.    The foregoing acts and conduct by Defendants have restrained or prevented competition and threaten and continue to restrain or prevent competition.

81.    Plaintiff and members of the Class have been injured in their business or property by reason of Fresh Del Monte's antitrust violation. Their injury consists of paying higher prices for extra-sweet pineapples in the United States than would otherwise predominate in a truly competitive market. Such injury is of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

82.    As a consequence, Plaintiff is entitled to a permanent injunction, restraining Defendants from engaging in additional anticompetitive conduct, to judgment pursuant to 15 U.S.C. § 15 awarding Plaintiff three-fold the damages sustained to its business or property, and to recover the costs and expenses of this action, including reasonable attorneys' fees.

## COUNT II
(Attempted Monopolization)

83.    Plaintiff incorporates by reference paragraphs 1 through 68, 75 and 79 herein.

84.    At all times relevant herein, Defendants possessed a monopoly over the fresh whole extra-sweet pineapple market.

85.    The fresh whole extra-sweet pineapple constitutes a relevant product market.

86.    Defendants possessed and acted with specific intent to achieve an anticompetitive purpose, including intent to prevent competitors from entering the market to grow, market, and sell fresh whole extra-sweet pineapple.

21

87.     Defendants engaged in one or more of the predatory or anticompetitive acts alleged in paragraphs 75 and 79.

88.     There is a dangerous probability that Defendants will be successful in achieving monopoly power in the fresh whole extra-sweet market.

89.     There is no pro-competitive justification for Fresh Del Monte's actions.

90.     Defendants acted with an anticompetitive purpose resulting in an anticompetitive effect.

91.     Defendants' acts and conduct have been committed for the following purposes:

(a)     to prevent competitors from entering the fresh whole extra-sweet pineapple market;

(b)     to maintain a monopoly over the propagation, marketing, and sale of fresh whole extra-sweet pineapple; and

(c)     to monopolize and attempt to monopolize the propagation, marketing, and sale of whole fresh extra-sweet pineapple.

92.     The foregoing acts and conduct by Defendants have restrained or prevented competition and threaten and continue to restrain or prevent competition.

93.     Plaintiff and members of the Class have been injured in their business or property by reason of Fresh Del Monte's antitrust violations. Their injury consists of paying higher prices for the extra-sweet pineapple in the United States than would otherwise predominate in a truly competitive market. Such injury is of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

94.     As a consequence, Plaintiff is entitled to a permanent injunction, restraining Defendants from engaging in additional anticompetitive conduct, to judgment pursuant to 15

22

U.S.C. § 15, awarding Plaintiff three-fold the damages sustained to its business or property, and to recover the costs and expenses of this action, including reasonable attorneys' fees.

## COUNT III
### (Unjust Enrichment)

95.    Plaintiff incorporates by reference paragraphs 1 through 68 herein.

96.    Defendants benefited from their unlawful acts through the receipt of overpayments by Plaintiff and other Class members. It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiff and members of the Class and retained by Defendants.

97.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments from which Plaintiff and other Class members may make claims on a pro-rata basis for restitution.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays:

A.    Declaring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants violated and are in violation of Section 2 of the Sherman Act and common law alleged herein;.

C.    Awarding three-fold damages sustained by Plaintiff and members of the Class as a result of the allegations alleged herein under applicable federal or common law;

D.    Ordering injunctive relief, preventing and restraining Defendants and all persons acting on their behalf from further engaging in the unlawful acts alleged herein;

E.    Awarding Plaintiff and members of the Class costs, interest, expenses, and reasonable attorneys' fees and experts' fees incurred in connection with this action; and

F.    Such further relief as may appear necessary and appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby

respectfully demands a trial by jury.

Dated: December 31, 2003

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**

By: _____
Peter A. Pease  BBO# 392880
Todd A. Seaver
One Liberty Square
Boston, MA  02109
Telephone:  (617) 542-8300
Fax:  (671) 542-8300

Sharon T. Maier
Christine G. Pedigo
**Berman DeValerio Pease Tabacco Burt
& Pucillo**
425 California Street, 21st Floor
San Francisco CA 94104
Telephone:  (415) 433-3200

R. Scott Palmer
Manuel J. Dominguez
**Berman DeValerio Pease Tabacco Burt
& Pucillo**
515 North Flagler Drive
Suite 1701
West Palm Beach, FL 33401
Tel:  (561) 835-9400

**Counsel for Plaintiff**